## CHARLES A. HECKSCHER

*v.*

## CHARLES W. TROTTER et al.

Pending a suit in this court by the owner of two mines for an accounting by their lessee, the complainant bought them, and then filed a bill against the lessee for an accounting as to *one* of the mines, after having issued an attach- ment at law for royalties alleged to be due from the lessee on account of the *other* mine.—*Held,* that the lessee might, by cross-bill, compel complainant to come to an accounting as to *both* mines in this suit, and that in order to entitle him to enjoin the attachment proceeding, his averments must show that the attachment is still pending.

*Mr. C. D. Thompson* and *Mr. H. C. Pitney,* for complainant.

*Messrs. Cortlandt & R. Wayne Parker,* for defendant Trotter.

BIRD, V. C.

The questions for discussion arise on motion by the complainant to strike out portions of the answer to the bill, and also portions of the answer by way of cross-bill, being all the cross-bill; and also on motion by the defendant to consolidate this suit and others. The bill filed by Heckscher shows that in 1877 Curtis was seized of a vein of franklinite ore, a mineral, situate at Mine Hill, in Sussex county, and that on the 6th day of March of that year, he entered into two agreements in writing, one of which was in the nature of an indenture or lease. By the lease Curtis bargained, granted, conveyed, demised, and to farm let unto Trotter, and to his heirs and assigns, for the term of thirty years, " all that certain westerly mine, vein, lode and bed of franklinite ore," describing it with particularity. This westerly portion or half is distinguished from the northern half, as will be seen hereafter. It will be seen that different claims arise from the different portions. Curtis reserved to himself, his successors and assigns, the one-half part of the net profits arising from mining and selling the ores and minerals. Trotter agreed to mine and sell the ores for thirty years, provided it could be done with reasonable profit and no obstructions should be made by legal proceedings; and that after the third year he would mine and sell every year seventy-five hundred tons, if it could be done at reasonable profit and no obstructions should be created by legal proceedings; that he would keep books of account and make statements every six months, and that he would pay to Curtis, his successors or assigns, one-half part of the net profits. It was further provided that in case Trotter should be hindered or delayed in carrying out any part of the agreement, by any suit at law or in equity, he should, during such time, be relieved from mining or selling ores. This indenture was signed by Curtis " as trustee of the Franklinite Mining Company." The agreement, which was executed at the same time, provided that Curtis

would pay to Trotter an amount equal to five per cent. of the total amount received on the sale of ores; and that he would pay also all expenses which should or might be incurred in defending the title to the premises.  It was agreed that Trotter should have the right from time to time to deduct all sums which might become due to him under the agreement from the one-half part of the net profits that Curtis should be entitled to under the lease, and that the said agreement should be binding on Curtis, his successors and assigns, during the continuance of the lease. This agreement was signed by Curtis as "trustee of the Franklinite Mining Company."  The bill declares that although the title was in Curtis, yet the Franklinite Steel and Zinc Company claimed that it was the equitable owner of said vein of ore, and that its interest was well known to Trotter, and that both of said instruments were made without its knowledge and in disregard of its rights.

The bill shows that Trotter took possession immediately and mined ore in large quantities, every year from two hundred and twenty-four tons to eight thousand six hundred and eighty-three tons.  The bill sets out another lease, dated March 24th, 1878, in and by which Curtis agreed that Trotter should have the right to take out from time to time from the rents and profits of Curtis, as such trustee, until the amount so taken out by him shall in the aggregate amount in value to twenty-five thousand tons of the ore mentioned in said lease.  This, Trotter was entitled to yearly thereafter, but not until after seven thousand five hundred tons of said ore should have been mined and disposed of under the lease; "and if for any reasons said Trotter shall not receive in any year the full value of two thousand five hundred tons of said ore, then such deficiency shall be paid to him the next succeeding year or years.     *     *     *     These stipulations to bind the successor of said lessor, and the legal representatives and assigns of said Charles W. Trotter."

The bill shows that, March 5th, 1883, said Curtis sold and conveyed the said vein of ore to the Franklinite Steel and Zinc Company, with the reversions, remainders, rents, issues and profits, and that said company thereby became seized in fee;

Heckscher *v.* Trotter.

and that on March 19th, 1883, the said company, as such owners in fee, sold and conveyed the same unto the complainant, Heckscher, with the reversions, remainders, rents, issues and profits; and that soon after he became the owner he demanded an account, and it shows that a dispute arose between him and Trotter as to what items should be included in the account, and then says that after long delay he did render an account, but that it was very unsatisfactory, and that it contains charges of law expenses which are uncertain and indefinite. The bill contains this statement:

"That in taking an account of said mining prior to March, 1883, said James L. Curtis and the Franklinite Zinc Company (whichever shall be found to be entitled to the rents and profits under said lease) will be entitled to credit against said Trotter for damages sustained during that period by reason of the failure of said Trotter to properly prosecute mining operations thereunder and to mine and carry away the quantity of ore therein provided for.  *  *  * And further, that said last-named company claims that a large amount is due to it for ore mined by said Trotter and carried away from said premises prior to March, 1883; and in making the said claim it disavows the said lease, and claims and charges that the same is void as to it, and that the said Trotter should account to it for the actual value of the ore mined and taken away between March, 1877, and March, 1883."

The bill further shows that the Franklinite Steel and Zinc Company, in September, 1882, filed its bill of complaint in this court against the said Trotter, Curtis, the Lehigh Zinc and Iron Company (Limited), and others, praying that the said lease and collateral agreements might be set aside as fraudulent and void as against it; or, if adjudged valid and binding in their inception, that the said Trotter might be declared to have forfeited the same, and that an account might be taken of all ores mined and taken away from said premises, and payment decreed therefor; and that the defendants therein named have answered said bill, but no account has been taken thereunder, and that said suit is still standing and undetermined in this court.

The bill prays that Trotter may account to the complainant, and that a receiver may be appointed.

I have stated the principal allegations of the bill, so that it may be seen from the bill itself that the field of inquiry is quite

extensive, and that others are interested besides Heckscher and Trotter.

Some portions of the answer ought to be stricken out, but not all according to the notice. I think they should be stricken out, because they are merely amplifications or enlargements of what already has been sufficiently stated, or because they are statements that do not pertain to the issue between the parties. I think all on page 28, after "1879," in line 11, and the first eleven lines on page 29. Under the view which I have taken of the case, I think the other portions asked to be stricken out should remain.

The motion to strike out the cross-bill is of much greater importance, and is of consequence to all the parties concerned. After the statements in the bill of complaint by Heckscher it will not be improper for me to give a few of the prayers of the cross-bill before stating its contents particularly. It prays that the bill of said Heckscher may be decreed to be a supplemental bill to that filed by the Franklinite Steel and Zinc Company, mentioned in the original bill; and that an account should be taken, not only as to the five hundred feet, but also as to the mine north thereof; and that a construction may be given to said leases; and that the rights, if any, of the other said defendants to said Heckscher's said bill of complaint may be adjusted as against him; and that he may be enjoined from prosecuting his writs of attachment.

The cross-bill, as well as the answer, admits the pendency of the suit by the Franklinite Steel and Zinc Company against Trotter, and charges that it is not equitable that he should be required to account in two suits; and says that notwithstanding the pendency of said suit as admitted by Heckscher, and that notwithstanding there can only be a proper accounting between all the parties in a court of equity, yet on the 19th of December, 1884, and in July, 1885, Heckscher sued out writs of attachment against Trotter for royalties under said lease of the northern mine (being the portion of the same vein directly north of the portion leased to Trotter, as named in the original bill of Heckscher). The cross-bill shows that, April 10th, 1879, Curtis, as trustee of the Franklinite Mining Company, leased this northern

portion of the vein to Trotter for fifteen years, for the considera-
tion of $1 per ton royalty for the first three years, and $2 per
ton for every year thereafter, and that Trotter agreed to mine
ten thousand tons each year, and to keep accounts and make
statements. The cross-bill shows also an agreement made at the
same time, which protected Trotter against the consequences of
delays from other person's claims, or from the interference of
others, and provided also for the payment of the costs and ex-
penses that should be incurred by Trotter in defending the title
to said northern portion of the mine; and it also shows that
Heckscher claims to have purchased from the Franklinite Steel
and Zinc Company, by deed bearing date the 19th of March,
1883, all the said northern part or half of said mine, and by
virtue thereof to have become entitled to all the rents, royalties
and profits which have accrued and become due upon both of the
said leases since the 19th of March, 1883. Other matters appear
in the cross-bill, but these suffice. Shall it be stricken out?

What is there in the case that makes the cross-bill important?
Heckscher has, or claims to have, the fee of both portions of the
mine; he claims the right to an account from Trotter for the
issues of both since November 19th, 1883, but only files a bill
against Trotter for an account of one; he shows in his bill that
the Franklinite Steel and Zinc Company claim to be entitled to
an accounting from Trotter, and that he took title from it, and
that a suit was begun by it for such accounting before he took
title, which suit is still pending; and, if he does not allege it, it
may be inferred that he knew of Trotter's right to just set-offs
for expenses arising from litigation respecting the title to both
portions of the mine. It will be seen that Heckscher volunteered
to come in and take these titles after the commencement of said
suit, and with full knowledge. Heckscher took subject to all
the rights and equities of Trotter against the grantors of Heck-
scher. Plainly, those rights and equities cannot be known until
the determination of the suit brought by the Franklinite Steel
and Zinc Company. And as plainly, Trotter has a just right to
look to the issues of the mine for his protection. He is not
bound, in case the accounting should result in his favor, to look

for pay to the Franklinite Steel and Zinc Company, and to give the issues of the mine to Heckscher. In my judgment, courts of equity do not so decree. It is true Heckscher asks for an accounting from the time he took title, but the charge and claim are that portions of the issues of the mines since that period will be required to re-imburse Trotter for just outlays and other demands prior to the date of his purchase. I conclude, therefore, that Heckscher took subject to an accounting between his grantors and Trotter, and that he is not entitled to an accounting until his grantors have had one.

This cross-bill is therefore proper. Although not altogether, it is somewhat in the nature of a bill of interpleader. The complainant in the cross-bill does not admit that he holds a sum due to one of the claimants, not knowing which, but he says that both of them are entitled to an accounting with him, and insists that he would be greatly wronged by accounting with Heckscher before doing so with the Franklinite Steel and Zinc Company. In this particular the case is not very dissimilar to those which have frequently arisen under the lien law, in which the owner is confronted with a number of lien claimants demanding the same fund. In such case he is entitled to his bill for relief.

Now I think, in the case before me, Heckscher can only prosecute his suit subject to the suit instituted by the Franklinite Steel and Zinc Company. But he is really interested in that suit. From the nature of the defence now shown by Trotter, Heckscher has a right to become a party to that suit and to be heard in resisting Trotter's claims. And by becoming such party he could maintain his rights and control the litigation, so far as speeding the cause might be demanded, in that, in suits for accounting, both parties are actors.

And I think that the cross-bill is maintainable on the ground that there is another mine besides the one named by Heckscher in his original bill in which both parties are interested, and respecting which accounts exist between them. This business should not be settled by halves. It may turn out that the operations of each half of the mine are separate and distinct, but it may also turn out that the balance in favor of one party or the other, in

one case, may be equaled or exceeded by the balance in the other case. There may be a corn account and a wheat account between merchants, but the court would require both to be adjusted in one suit. The fact that the different grains were kept in different places would make no difference in the principle governing the litigation.

I cannot advise a consolidation of the suits of the Franklinite Steel and Zinc Company with the suits between Heckscher and Trotter, in the just sense of that term. I do not feel justified in going further than staying the suit now instituted by Heckscher until the determination of the suit between the company and Trotter, permitting him, if he asks it, to become a party thereto, that he may have a voice in controlling it.

This brings me to the questions, Shall an injunction issue, staying the actions at law by way of attachment commenced by Heckscher for the royalty for ores that Trotter has mined, or should have mined, and shall those suits at law be consolidated with this suit instituted by Heckscher in this court? After what I have said, it would seem that an injunction ought to issue; for why should there be an action at law and a suit in equity concerning the same items of account? Here arise, in plain view, principles that often move this court to interfere with proceedings at law. And certainly, the facts being as agreed upon in both bill, answer and cross-bill, there is no just reason for an accounting in more than one court, which would at first blush make consolidation of this suit and those actions in attachment very proper, if not essential. I say at first blush, for upon reflection it will occur that possibly the court would better be content with the injunction simply staying those suits, since it may be of just advantage to Heckscher to have the benefit of the lien which he has acquired by his diligence. Letting the case rest here, no harm will follow, and if in the end, when the accounting is complete, it appears that the matters covered by the attachment proceedings have been decided in this court, the injunction can be made perpetual. Thus all the purposes of consolidation will have been accomplished.

But it is urged that no foundation is laid in the cross-bill for

an injunction.　This insistment arrests my attention.　The cross-bill alleges that on the 19th of December, 1884, and about July, 1885, Heckscher sued out two writs of attachment against Trotter for royalties under said leases of the northern mine, and caused the same to be levied on Trotter's leases and mining plant, and says it is inequitable that that suit should be tried at law, not only because there is a suit already pending in this court for an account as to such leases, but also because the question cannot properly be tried at law, involving matters of great intricacy.　The most of this is substantially repeated in another paragraph, to which is added that Heckscher claims the right to recover such royalty in full at law.　Is there enough in this to justify the court in awarding a restraining order?　Is the *status* or present condition of the action at law sufficiently defined?　All that is alleged is that two writs of attachment have been issued and served.　It is not alleged that the writs have been returned, nor that any other proceedings whatever have been had therein. Indeed, there is nothing in the cross-bill from which it can be inferred that the said actions at law are still pending.　Is this sufficiently explicit and ample to warrant the court in awarding an injunction?　I do not see my way clear to advise an injunction upon such uncertainties.　See *High on Inj.* § *49.*

As both parties prevail in part and fail in part, no costs will be awarded to either.